UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **INDUSTRIAL CORNER CORP.,**<br><br>Plaintiff,<br><br>v.<br><br>**PUBLIC SERVICE MUTUAL INSURANCE COMPANY and ARROWOOD INDEMNITY COMPANY,**<br><br>Defendants. | Civ. No. 20-06677 (KM) (ESK)<br><br>OPINION |

**KEVIN MCNULTY, U.S.D.J.:**

Plaintiff Industrial Corner Corporation ("ICC") filed this civil action against two of its insurers, Public Service Mutual Insurance Company ("PSM") and Arrowood Indemnity Company ("Arrowood" and collectively, the "Defendants"), alleging that Defendants breached certain of their policy agreements by failing to fund the environmental investigation and remediation of contaminated property owned by ICC.

Now before the Court are Defendants' motions for summary judgment, as well as ICC's cross motions for summary judgment. For the reasons expressed below, PSM's motion for summary judgment is **DENIED**, Arrowood's motion for summary judgment is **DENIED**, and ICC's cross motions for summary judgment are **DENIED**.

I.  **BACKGROUND**[1]

A.  **Facts**

This case arises out of an insurance coverage dispute between ICC and two of its insurance providers, PSM and Arrowood, regarding environmental

---

[1] Certain citations to record are abbreviated as follows:

"DE" = Docket entry number in this case

contamination that occurred on ICC's property at 767 Leesville Avenue in Rahway, New Jersey (the "Property"). ICC claims that PSM and Arrowood have breached their policy agreements with ICC by failing to fund the remediation of the Property, for which ICC now seeks damages as well as injunctive relief. PSM and Arrowood have both moved for summary judgment on the basis that because ICC brought two prior lawsuits pertaining to the contamination of the

---

"Compl." = ICC's Amended Complaint and Jury Demand, with Claim for Declaratory Relief (DE 15)

"PSM St." = PSM's Statement of Undisputed Material Facts (DE 48-3)

"PSM Mot." = Brief in Support of the Motion for Summary Judgment on Behalf of Defendant Public Service Mutual Insurance Company (DE 48-4)

"Arrowood Mot." = Brief in Support of Arrowood Indemnity Company's Motion for Summary Judgment (DE 49-2)

"Arrowood Opp." = Plaintiff's Brief in Opposition to Defendant Arrowood Indemnity Company's Motion for Summary Judgment, and in Support of Plaintiff's Cross-Motion for Summary Judgment (DE 53)

"ICC St. 1" = Plaintiff's Statement of Material Facts in Opposition to Motion of Defendant Arrowood Indemnity Company for Summary Judgment, and Supplemental Statement of Material Facts in Support of Cross-Motion for Summary Judgment (DE 53-2)

"PSM Opp." = Plaintiff's Statement of Material Facts in Opposition to Motion of Defendant Public Service Mutual Insurance Company for Summary Judgment, and Supplemental Statement of Material Facts in Support of Cross-Motion for Summary Judgment (DE 54)

"ICC St. 2." = Plaintiff's Statement of Material Facts in Opposition to Motion of Defendant Public Service Mutual Insurance Company for Summary Judgment, and Supplemental Statement of Material Facts in Support of Cross-Motion for Summary Judgment (DE 54-2)

"Arrowood Resp." = Defendant Arrowood Indemnity Company's Responses to Plaintiff's Supplemental Statement of Material Fact (DE 58-1)

"PSM Resp." = Defendant Public Service Mutual Insurance Company's Statement of Material Facts and Opposition of the Plaintiff's Cross-Motion for Summary Judgment (DE 63 at 2-5)

Property, its current claims are precluded by New Jersey's entire controversy doctrine.[2] (PSM Mot. at 5; Arrowood Mot. at 2.)

### 1. The Property[3]

ICC has owned the Property since approximately 1971. (PSM Opp. at 2.) From around 1971 until 2008, ICC leased the Property to Meridian Industrial Knit Finishing, Ltd. and its successor entity, Summit Finishing, Inc. (collectively "Summit"). (*Id.* at 2-3.) Summit conducted operations on the Property that involved the use of perchloroethylene ("PCE"), a solvent used to clean metal and dry-clean fabric. (*Id.* at 3.) Around 1974, a substantial quantity of PCE spilled onto the ground from an above-ground storage tank on the Property, resulting in soil and groundwater contamination.[4] (*Id.*) The Rahway Health Department, along with the New Jersey Department of Environmental Protection ("NJDEP"), performed an inspection of the Property in 1987 and issued Summit a case number pertaining to the contamination. (*Id.*) Summit did not inform ICC about the contamination issue until the early 1990s, following lease renewal negotiations. (*Id.*)

### 2. Prior Lawsuits

On December 31, 2008, ICC filed suit in the Superior Court of New Jersey, Union County, against Summit and its principal, Bruce Blackman (the "Tenant Action"), seeking damages for the contamination at the Property pursuant to New Jersey's Spill Act, N.J. Stat. § 58:10-23.11, as well as certain

---

[2] In its opposition briefs, ICC argued that PSM and Arrowood were barred from raising their entire controversy doctrine arguments at summary judgment because they did not assert them as affirmative defenses. (PSM Opp. at 11-12; Arrowood Opp. 10-11.) The Court has since granted Defendants leave to amend their answers (DE 70, DE 77), rendering this argument moot.

[3] For ease of reference, citations in sub-sections I.A.1 and I.A.2 only to ICC's opposition to PSM's motion for summary judgment (DE 54) and the Statement of Undisputed Facts contained therein (DE 54-2). Neither defendant disputes the facts regarding the Property or the prior lawsuits as presented in these sub-sections.

[4] According to ICC, other PCE spills may have taken place on the Property over the years, and these might have contaminated the groundwater. (PSM Opp. at 3.)

provisions of Summit's lease. (ICC St. 2 Supp. ¶ 19.) On August 14, 2012, a final judgment was entered against Summit in the amount of $297,573.88 for breach-of-lease damages and $7,401.69 for environmental costs as of that date. (*Id.* Supp ¶ 20.) The judgment in the Tenant Action stated that Summit was liable to ICC for all future costs and expenses arising from the discharge of hazardous substances at the Property during the period of October 16, 1971 through November 14, 2008. (*Id.* Supp ¶ 21.)

Summit did not comply with the requirements of the judgment. On May 23, 2011, Summit filed a declaratory judgment action in the Superior Court of New Jersey, Union County, against TIG Insurance Company ("TIG"), seeking to enforce TIG's coverage obligations to Summit for the claims asserted in the Tenant Action. (*Id.* Supp ¶ 22.) On September 28, 2012, the Court entered an order in favor of TIG in connection with Summit's failure to comply with discovery obligations. (*Id.* Supp ¶ 23.) In 2014, ICC commenced a direct action against TIG in the Superior Court of New Jersey, Union County (the "TIG Action"), seeking to recover the sums awarded under the judgment against Summit in the Tenant Action. (*Id.* Supp ¶ 24.) ICC settled the TIG Action for $737,500. (*Id.* Supp ¶ 33.)

### 3. Claims Against PSM

ICC contends that the Property was insured by defendant PSM under certain insurance policies issued between 1977 and 1987 and that, pursuant to those policies, PSM owes ICC coverage for environmental remediation of the Property. (PSM St. ¶ 4; ICC St. 2 ¶ 4.) Moreover, ICC argues that there is evidence to show that PSM confirmed this obligation and took affirmative steps toward providing coverage. Specifically, ICC points to a July 5, 2018 letter sent by PSM's environmental consultant, French & Parello Associates ("FPA"), to the NJDEP regarding environmental issues on the Property. (ICC St. 2 Supp. ¶ 4.) In the letter, F&P stated the following:

> FPA performed a thorough file review [on behalf of PSM], conducted several site visits, interviewed representatives of ICC and teleconferenced with

4

> Elizabeth Opitz, Andrew Sites, and Robert Gallagher of NJDEP. In addition to performing the below actions FPA is currently preparing a Remedial Investigation Workplan (PIWP).
>
> . . . . .
>
> Public Service Insurance Company, the insurer for ICC retained FPA to comply with the Directive and oversee the remediation at the subject site.
>
> . . . . .
>
> Effective January 1, 1987, insurance companies added the Absolute Pollution Exclusion to policies written after this date. ICC appears to have insurance policies for the period of November 15, 1977 to November 15, 1987, nine years, which are not subject to the Absolute Pollution Exclusion. In 1987, during the insurance renewal, the policy would become subject to the Absolute Pollution Exclusion and for each year going forward.
>
> . . . . .
>
> [PSM] will pay the costs of remediation on behalf of ICC and in accordance with relevant insurance coverages.
>
> . . . . .
>
> FPA on behalf of ICC and [PSM] will clean-up and remove hazardous substances discharged at the site in accordance with NJDEP Regulations. The timeframes depicted in the Directive spanned from June 2017- to June 2018. FPA was hired circa January 2018 by [PSM]. We proceeded with a thorough review of historical reports while pursuing site access. In May 2018, FPA received authorization from ICC to enter the site via access agreement.

(ICC St. 2 Supp. ¶¶ 2-8; PSM Resp. ¶¶ 2-8.)

Also relevant to this action is PSM's involvement in litigating and settling the TIG Action. ICC points to correspondence with PSM to show that ICC provided PSM with updates on the progress of the case, and that PSM provided input and direction in return. For instance, ICC produced a letter dated April

5

26, 2018 in which environmental counsel for ICC provided coverage counsel for PSM an update regarding settlement negotiations with TIG. In the letter, counsel for ICC states that because ICC was "an insured of [PSM] which is expending monies on behalf of [ICC] pursuant to its insurance policies, to respond to the directive by the [NJDEP]," ICC could "no longer settle with TIG without the consent and approval of [PSM]."[5] (ICC St. 2 Supp. ¶ 25; PSM Resp. ¶ 25.) In addition, counsel for PSM participated in a March 2019 settlement conference in the TIG Action. (ICC St. 2 Supp. ¶ 30; PSM Resp. ¶ 30.) According to PSM, during the conference, its coverage counsel clarified for the Court that PSM was not party to the case and that it had not made any coverage determination as to the TIG Action.[6] (PSM Resp. ¶ 30.)

According to ICC, the two companies had an understanding that the $737,500 judgment ICC received from the settlement of the TIG Action was to be credited against PSM's coverage responsibilities. (PSM Opp. at 11.) PSM, on the other hand, insists it never admitted ICC had any rights to coverage in the first place. (PSM Resp. ¶ 35.)

### 4. Claims Against Arrowood

ICC claims that the Property was also insured by predecessor entities of defendant Arrowood and that, as a result, Arrowood also owes ICC coverage for environmental remediation of the Property. Although neither ICC nor Arrowood has been able to locate ICC's original policy agreement, ICC provided Arrowood secondary evidence that it had purchased an insurance policy from one of Arrowood's predecessors, including cancelled checks evidencing premium

---

[5]  Later in the letter, counsel for ICC also proposed an agreement with PSM to assign ICC's claim against TIG to PSM in exchange for, *inter alia*, PSM's acknowledgement of its obligation to conduct the investigation and remediation required by the NJDEP. (ICC St. 2 Supp. ¶ 25.) The record is unclear as to whether any such agreement was ever executed.

[6]  Critically, PSM concedes that during the conference, ICC asked the Court to grant it leave to name PSM as a defendant in the TIG Action, but the Court denied ICC's request. (*Id.*)

6

payments; an invoice dated April 27, 1977; and a Notice of Nonrenewal dated December 6, 1977. (ICC St. 1 Supp. ¶ 4; Arrowood Resp. ¶ 4.)

According to ICC, it provided Arrowood with a notice of claim on February 3, 2009 in a letter from ICC's environmental counsel regarding the contamination of the Property. (ICC St. 1 Supp. ¶ 1) Arrowood acknowledges receipt of this letter but maintains that it was not a formal notice of claim, as the letter only noted the existence of a "*potential* claim for coverage" (Arrowood Resp. ¶ 1 (emphasis added).) Arrowood maintains that it was unaware ICC intended to make a claim against an Arrowood policy until ICC filed the present action. (*Id.*)

### B. Procedural History

ICC initiated this action on June 1, 2020, naming PSM as the sole defendant in the case. (DE 1.) On April 27, 2021, ICC filed its operative pleading, amending its complaint to add Arrowood as a defendant. (DE 15.) On July 22, 2022, Defendants each moved for summary judgment. (DE 48; DE 49.) On August 23, 2022, ICC filed briefs in opposition to each of the summary judgment motions and simultaneously cross-moved for summary judgment against each of the Defendants. (DE 53; DE 54.) On September 14, 2022, Arrowood filed a reply brief in support of its motion for summary judgment and in opposition to ICC's cross motion for summary judgment against Arrowood. (DE 58.) On September 29, 2022, PSM filed a reply brief in support of its motion for summary judgment and in opposition to ICC's cross motion for summary judgment against PSM. (DE 63.) The parties' motions for summary judgment are fully briefed and ripe for decision.

## II. LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude the Court from granting a motion for summary judgment. *See id.*

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "A party asserting that a fact [is not] genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents . . ., affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted). To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F.Supp.2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50)). "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate. *Anderson*, 477 U.S. at 250-51.

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F. 3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)). In that respect, the Court's role in deciding a motion for summary judgment is simply "to

determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

When, as here, the parties file dueling motions for summary judgment, the governing standard "does not change." *Auto-Owners Ins. Co. v. Stevens & Ricci, Inc.*, 835 F.3d 388, 401 (3d Cir. 2016) (citing *Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987)). The court must consider the motions independently, in accordance with the principles outlined above. *Goldwell of N.J., Inc. v. KPSS, Inc.*, 622 F. Supp. 2d 168, 184 (D.N.J. 2009); *Williams v. Philadelphia Housing Auth.*, 834 F. Supp. 794, 797 (E.D. Pa. 1993), *aff'd*, 27 F.3d 560 (3d Cir. 1994). That one of the cross-motions is denied does not imply that the other must be granted. For each motion, "the court construes facts and draws inferences in favor of the party against whom the motion under consideration is made" but does not "weigh the evidence or make credibility determinations" because "these tasks are left for the fact-finder." *Pichler v. UNITE*, 542 F.3d 380, 386 (3d Cir. 2008) (internal quotation and citations omitted).

### III.  DISCUSSION[7]

#### A. Defendants' Motions for Summary Judgment

PSM and Arrowood both argue that they are entitled to summary judgment because New Jersey's entire controversy doctrine required ICC to

---

[7]  This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332. The parties appear to agree that there is complete diversity, as ICC is a New Jersey corporation with its principal place of business in New Jersey, PSM is an Illinois corporation with its principal place of business in New York, and Arrowood is a holding company organized under the laws of Delaware with its principal place of business in North Carolina. (Compl. ¶ 5.) The amount in controversy exceeds the jurisdictional threshold of $75,000. (ICC St. 1 Supp. ¶ 20; Arrowood Resp. ¶ 20 (noting that on December 15, 2021, the NJDEP issued an Administrative Order and Notice of Civil Administrative Penalty Assessment in the amount of $138,775 against ICC in connection with contamination at the Property).)

raise its current claims during one of its previous lawsuits and, because it did not do so, those claims are precluded. For the following reasons, I find that the entire controversy doctrine does not apply to ICC's claims and Defendants' motions must therefore be denied.

The entire controversy doctrine is currently codified in Rule 4:30A of the New Jersey Rules of Court, which provides that "[n]on-joinder of claims required to be joined by the entire controversy doctrine shall result in the preclusion of the omitted claims to the extent required by the entire controversy doctrine." N.J. Ct. R. 4:30A.

The entire controversy doctrine has been described as "New Jersey's specific, and idiosyncratic, application of traditional res judicata principles." *Rycoline Prods., Inc. v. C & W Unlimited*, 109 F.3d 883, 886 (3d Cir. 1997). The doctrine precludes, not just claims actually decided by a prior judgment, but *all claims* that a party could and should have joined in a prior case based on the same transaction or occurrence. The doctrine "seeks to assure that all aspects of a legal dispute occur in a single lawsuit." *Olds v. Donnelly*, 636 A.2d 633, 637 (N.J. 1997). Its purposes are "(1) to encourage the comprehensive and conclusive determination of a legal controversy; (2) to achieve party fairness, including both parties before the court as well as prospective parties; and (3) to promote judicial economy and efficiency by avoiding fragmented, multiple and duplicative litigation." *Mystic Isle Dev. Corp. v. Perskie & Nehmad*, 662 A.2d 523, 529 (N.J. 1995).

There are three requirements for the application of the entire controversy doctrine:

> (1) the judgment in the prior action must be valid, final, and on the merits; (2) the parties in the later action must be identical to or in privity with those in the prior action; and (3) the claim in the later action must grow out of the same transaction or occurrence as the claim in the earlier one.

*McNeil v. Legislative Apportionment Comm'n of State*, 828 A.2d 840, 859 (N.J. 2003) (citation omitted).

### 1. Final Judgment on the Merits

The first factor, requiring a final judgment on the merits, is satisfied. As I note *supra,* the parties agree that a final judgment was entered in the Tenant Action. The TIG Action, on the other hand, resulted in a settlement, pursuant to which it appears the parties voluntarily dismissed the action with prejudice. A dismissal with prejudice constitutes an adjudication on the merits "as fully and completely as if the order had been entered after trial." *Petrossian v. Cole*, 613 F. App'x 109, 111–12 (3d Cir. 2015) (quoting *Gambocz v. Yelencsics*, 468 F.2d 837, 840 (3d Cir. 1972)); *see also Jackson v. Dow Chem. Co.*, 518 F. App'x 99, 102 (3d Cir. 2013) ("[Plaintiff's] voluntary dismissal with prejudice of his remaining ADA claims also operated as a final judgment on the merits for purposes of claim preclusion."). Accordingly, I find that the voluntary dismissal in the TIG Action was a final judgment on the merits and that this element of the entire controversy doctrine is satisfied.

### 2. Privity of the Parties

Neither PSM nor Arrowood was a party to Tenant Action or the TIG Action. Therefore, for the entire controversy doctrine to apply, they must be in privity with a party to those actions. I find that they are.

In comparison to federal preclusion principles, New Jersey has adopted a broader definition of "privity." *See Opdycke v. Stout*, 233 F. App'x 125, 129 n. 6 (3d Cir. 2007). "In New Jersey, privity is merely a word used to say that the relationship between the one who is a party on the record and another is close enough to include that other within the res judicata." *Hamburg Music Corp. v. Winter,* No. 04-2738, 2005 WL 2170010, at *3 (3d Cir. Sept. 8, 2005) (citation and quotation omitted). Less circularly, a relationship is defined as being "close enough" to satisfy privity "when the party is a virtual representative of the non-party, or when the non-party actually controls the litigation." *Collins v. E.I. DuPont de Nemours & Co.*, 34 F.3d 172, 176 (3d Cir. 1994). Here, the pre-existing legal relationship between ICC and each of the Defendants created by the relevant insurance agreements is enough to establish privity for the

11

purpose of this preclusion analysis. *See Zirger v. Gen. Accident Ins. Co.*, 676 A.2d 1065, 1071 (N.J. 1996) (citation omitted) (holding that "one person is in privity with another and is bound by and entitled to the benefits of a judgment as though he was a party when there is such an identification of interest between the two as to represent the same legal right"). The second factor is therefore satisfied.

### 3. Transactionally Related

The real problem arises with respect to the third factor: whether the claims in the present action arise from the same transaction or occurrence as the Tenant Action and TIG Action. I conclude that they do not. The current claims against PSM and Arrowood are ancillary to the merits of those actions and, in any event, ICC's claims were not ripe at the time of the Tenant Action or the TIG Action.

This third factor requires that the facts of the later action be sufficiently related to the facts giving rise to the underlying action, such that the two actions "arise from related facts or the same transaction or series of transactions." *Fields v. Thompson Printing Co.*, 363 F.3d 259, 265 (3d Cir. 2004) (citation omitted). "It is the core set of facts that provides the link between distinct claims against the same or different parties and triggers the requirement that they be determined in one proceeding." *DiTrolio v. Antiles*, 662 A.2d 494, 502 (N.J. 1995). The court must consider the factual context "giving rise to the controversy itself, rather than a commonality of claims, issues or parties." *Mystic Isle Dev. Corp.*, 662 A.2d at 529. "In the absence of such a factual nexus, a party is not required to join all of its claims against another party in a single action." *McNally v. Providence Washington Ins. Co.*, 698 A.2d 543, 548 (N.J. Super. App. Div. 1997).

ICC's present claims arise from different transactions from the ones that were the subject of the Tenant Action and the TIG Action. This case arises from insurance policies issued by PSM and Arrowood, whereas the Tenant Action primarily concerned Summit's lease agreement with ICC, and the TIG Action

involved Summit's insurance policy with TIG. It follows, then, that the facts of the Tenant Action and the TIG Action are distinct from the facts necessary for ICC to prove its claims in the present action. In basic terms, the Tenant Action concerned whether Summit was liable for the PCE contamination that took place on the Property, and the TIG Action concerned whether insurance coverage TIG provided to Summit in connection with Summit's business operations on the Property required TIG to pay for the portion of the judgment in the Tenant Action that Summit failed to satisfy. In contrast, the present action turns on a distinct set of factual issues, *e.g.,* what the terms of ICC's agreement with Arrowood's predecessor were, and whether PSM agreed to cover certain costs of remediation following ICC's settlement with TIG.

That these disputes all trace back in some way to the PCE spill in 1974 does not imply that ICC was required to bring its current claims during one or both of its two previous lawsuits. In fact, ICC *could not* bring these claims during either of the previous lawsuits because at the time, the present claims were not ripe. "The entire controversy doctrine does not apply to bar component claims that are unknown, unarisen, or unaccrued at the time of the original action." *In re Mullarkey*, 536 F.3d 215, 229 (3d Cir. 2008); *see also K-Land Corp. No. 28 v. Landis Sewerage Auth.*, 173 N.J. 59, 74 (2002) ("The entire controversy doctrine does not compel a plaintiff to file 'premature or unaccrued claims.'") (citation omitted).

At the time ICC was litigating the later TIG Action, PSM was working cooperatively with its insured. PSM was actively involved in the litigation, providing direction to ICC's environmental counsel, and even participating in a settlement conference before the Court. PSM's own statement about its participation in the TIG Action shows that that there was no live dispute between ICC and PSM at the time. According to PSM, when it attended a 2019 settlement conference, it "made it clear to the court that we were not a litigant nor made any coverage determination as to that action." (PSM Resp. ¶ 30.) PSM goes on to state that "counsel for ICC suggested the Court allow it leave to

name PSM as a defendant to that action, [] which the Court refused." (*Id.*) PSM cannot invoke the entire controversy doctrine to bar ICC from bringing claims against it when, as PSM concedes, ICC could not have brought those claims in the previous action.

The same reasoning applies to ICC's claims against Arrowood. Arrowood contends that because ICC did not bring claims against it as part of the Tenant Action or the TIG Action, ICC's present claims are precluded. But ICC did not have a live dispute with Arrowood during the pendency of either of those actions. ICC sent Arrowood a notice of claim in February 2009, and like PSM, Arrowood never denied coverage in connection with the remediation of the Property. Even if I were to credit Arrowood's questionable position that ICC's letter was not a notice of claim, but only correspondence regarding a "potential" claim, the analysis would not change. Arrowood had not denied coverage prior to the conclusion of the Tenant Action and the TIG Action (ICC St. 1 Supp. ¶ 12; Arrowood Resp. ¶ 12), and therefore a claim had not accrued.

In sum, ICC's present claims are not transactionally related to those ICC asserted in its previous lawsuits, in part because ICC's present claims had not accrued when those actions were being litigated. Because the third factor of the entire controversy doctrine is not satisfied, I conclude that it does not preclude ICC's claims. Accordingly, Defendants' motions for summary judgment must be denied.[8]

---

[8]     Both PSM and Arrowood argue that the Court should grant them summary judgment because they were prejudiced by ICC's failure to provide timely notice of the claimed loss. (PSM Mot. at 7; Arrowood Mot. at 4-5.) PSM also argues that is entitled to summary judgment because its insurance agreements with ICC contained certain policy exclusions that disclaimed coverage. (PSM Mot. at 7.) Both arguments fail as a basis for summary judgment, because they implicate disputed issues of material fact. First, whether ICC failed to provide Defendants with timely notice, and the extent to which such delay might have, for example, "caused or contributed to changing conditions at the property that may have been properly remediated" at an earlier time (PSM Mot. at 7) are questions of fact that must be determined by the factfinder. Second, whether ICC's insurance policies were subject to certain exclusions that shielded Defendants from liability is also a factual question that must be left to the factfinder given that no such provisions have been produced. Because these are

### B. ICC's Cross Motions for Summary Judgment

ICC argues that it is entitled to summary judgment against both Defendants on its breach of contract claims. Because there remain in dispute several genuine issues of material fact pertaining to the terms of ICC's agreements with PSM and Arrowood, as well as the parties' performance of their obligations thereunder, ICC's motion for summary judgment must be denied.

To establish a breach of contract, a claimant must show (1) "that the parties entered into a valid contract"; (2) "that the defendant failed to perform [its] obligations under the contract"; and (3) "that the plaintiff sustained damages as a result." *Murphy v. Implicito*, 392 N.J.Super. 245, 920 A.2d 678, 689 (App. Div. 2007).[9] "A contract exists when there was a meeting of the minds, there was an offer and acceptance, there was consideration, and there was certainty in the terms of the agreement." *See Allen-White v. Bloomingdale's,*

---

genuine issues of disputed material fact, summary judgment is inappropriate. *Celotex*, 477 U.S. at 323.

[9]   "[I]n a diversity action, a district court must apply the choice of law rules of the forum state to determine what law will govern the substantive issues of a case." *Warriner v. Stanton*, 475 F.3d 497, 499–500 (3d Cir.2007) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). New Jersey uses the most-significant-relationship test, which consists of two prongs. *Maniscalco v. Brother Int'l Corp. (USA)*, 793 F.Supp.2d 696, 704 (D.N.J.2011), *aff'd*, 709 F.3d 202 (3d Cir.2013). First, the court must determine whether a conflict actually exists between the potentially applicable laws. *P.V. v. Camp Jaycee*, 197 N.J. 132, 143 (2008) ("Procedurally, the first step is to determine whether an actual conflict exists. That is done by examining the substance of the potentially applicable laws to determine whether there is a distinction between them.") (internal quotations omitted). "[I]f no conflict exists, the law of the forum state applies." *Snyder v. Farnam Companies, Inc.*, 792 F.Supp.2d 712, 717 (D.N.J. 2011) (quoting *P.V.*, 197 N.J. at 143). If a conflict exists, the court then moves to the second prong: it must determine "which state has the 'most significant relationship' to the claim at issue by weighing the factors" in the applicable section of the Restatement (Second) of Conflict of Laws. *Gilbert Spruance Co. v. Pennsylvania Mfrs. Ass'n Ins. Co.*, 134 N.J. 96, 102 (1993). The parties seem to agree that New Jersey law applies in this diversity action. At any rate, they point to no aspect in which the application of non-forum law would change the result. Having been directed to no applicable conflict, I apply general principles of New Jersey contract law.

15

*Inc.*, 225 F. Supp. 3d 254, 258 (D.N.J. 2016). A meeting of the minds "occurs when there has been a common understanding and mutual assent of all the terms of a contract." *See Knight v. New Eng. Mut. Life Ins. Co.*, 220 N.J. Super. 560 (App. Div. 1987).

ICC argues that "there is nothing to litigate" with respect to its insurance agreement with PSM. Indeed, says ICC, the contents of F&P's July 5, 2018 letter to the NJDEP are sufficient in themselves to warrant summary judgment in its favor. (PSM Opp. at 20-22.) F&P's letter, says ICC, confirms "dispositive facts" including that 1) PSM sold applicable general liability insurance to ICC for each year from 1977 to 1987, with a $1 million annual limit, 2) environmental damage had taken place during PSM's policy periods, 3) PSM had hired FPA to investigate and remediate the Property, 4) FPA conducted a detailed investigation of the Property, and 5) PSM was responsible for the investigation and remediation of the Property. (*Id.* at 21-22.) To be sure, F&P's letter provides some evidence that PSM issued an insurance policy to ICC and that PSM had taken steps toward investigating the environmental issues on the Property. The letter does not, however, constitute "dispositive" proof that PSM failed to perform its obligations under any of the policies it issued to ICC. In fact, the terms of the relevant policies and whether PSM complied with those terms remain in dispute. According to PSM, for instance, the relevant agreements contained policy exclusions that shield it from liability in this action. (PSM Mot. at 7.) Moreover, notwithstanding the contents of F&P's letter, PSM denies "it had any obligation to perform any work at the subject property." (PSM Resp. ¶ 16.) Because these factual disputes bear on the elements of ICC's breach of contract claim, summary judgment against PSM is not appropriate.

ICC's argument that it is entitled to summary judgment against Arrowood fails for similar reasons. Though Arrowood admits that ICC provided it with secondary evidence of an insurance policy issued by a predecessor entity, Arrowood denies having "confirmed the existence and terms of Arrowood's coverage." (Arrowood Resp. ¶ 11.) I cannot award ICC summary judgment against Arrowood and make a finding that Arrowood breached an

16

agreement with ICC when unresolved factual issues remain regarding the terms of the underlying agreement and even whether any agreement was reached in the first place.

Genuine issues of fact remain as to whether PSM and Arrowood had any obligation to provide coverage to ICC for the investigation and remediation of the Property. Viewing the facts in the light most favorable to the Defendants, I must deny ICC's cross motions for summary judgment.

## IV. CONCLUSION

For the reasons set forth above, PSM's motion for summary judgment is **DENIED**, Arrowood's motion for summary judgment is **DENIED**, and ICC's cross motions for summary judgment are **DENIED**.

An appropriate order follows.

Dated: February 8, 2023

/s/ Kevin McNulty

_____

**Hon. Kevin McNulty
United States District Judge**